UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
Urbana Division

| | |
|---|---|
| **ROBERT J. WATSON, IV,** )<br>)<br>**Plaintiff,** )<br>v. )<br>)<br>**COMMISSIONER OF SOCIAL SECURITY,** )<br>**sued as Michael J. Astrue,** )<br>)<br>**Defendant.** ) | Case No. 08-2173 |

## REPORT AND RECOMMENDATION

In November 2007, Administrative Law Judge (hereinafter "ALJ") Joseph Warzycki denied Plaintiff Robert Watson, IV's application for disability insurance benefits (hereinafter "DIB") and supplemental security income (hereinafter "SSI"). The ALJ based his decision on findings that, although Plaintiff suffers from a severe impairment, he retains the capability to perform past relevant work, therefore he is not disabled within the meaning of the Social Security Act.

In July 2008, Plaintiff filed a Complaint (#3) against Defendant Michael Astrue, the Commissioner of Social Security, seeking judicial review of the ALJ's decision to deny DIB and SSI. In February 2009, Plaintiff filed a Motion for Summary Judgment (#12). In May 2009, Defendant filed a Motion for an Order Which Affirms the Commissioner's Decision (#15). After reviewing the administrative record and the parties' memoranda, this Court recommends, pursuant to its authority under 28 U.S.C. § 636(b)(1)(B), that Plaintiff's Motion for Summary Judgment **(#12)** be **GRANTED**.

### I. Background
### A. Procedural Background

Plaintiff applied for DIB and SSI in April 2004, alleging disability beginning April 5, 2004. The Social Security Administration (hereinafter "SSA") denied Plaintiff's application in September 2004, and again upon reconsideration in May 2005. Plaintiff filed a request for hearing, and the ALJ held a hearing in August 2007. Plaintiff was represented by counsel at the

hearing and both Plaintiff and his mother testified. In November 2007, the ALJ denied Plaintiff's application for DIB and SSI based on findings that Plaintiff was not disabled within the meaning of the Social Security Act and that he was capable of performing his past relevant work.

In May 2008, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the Commissioner's final decision. Plaintiff then appealed this decision by filing a complaint with this Court pursuant to 42 U.S.C. § 405 (g). Plaintiff seeks an outright reversal. In the alternative, he asks the court to remand for reconsideration.

### B. Plaintiff's Background

Plaintiff was 31 years old at the alleged onset of his disability. Although he has a high school diploma based on special education classes, he testified that he cannot read or write. Plaintiff is divorced and lives with his eight-year old son in his parents' basement. He also has a sixteen-year old son who does not live with him. Plaintiff has past work as a delivery driver, foundry laborer, carpet floor layer, and hand packager.

In July 2004, Dr. James Mason, a licensed clinical psychologist, performed a consultative evaluation and completed a psychological report on Plaintiff. (R. 161-63.) On the Wechsler Adult Intelligence Scale - Third Edition (WAIS-III), Plaintiff obtained a full scale IQ of 76, a verbal IQ of 75, and a performance IQ of 80. (R. 162.) Dr. Mason opined that Plaintiff was functioning within the range of Borderline Mental Retardation. (R. 163.)

In August 2004, Dr. Phyllis Brister, a psychologist, completed a psychiatric review technique and a mental residual functional capacity assessment. (R. 169-82, 165-67.) Dr. Brister evaluated whether Plaintiff was disabled pursuant to Listing 12.05 and determined that Plaintiff has a medically determinable impairment but his condition does not satisfy the diagnostic criteria of the Listing. (R. 173.) Dr. Brister opined that Plaintiff had mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of

decompensation. (R. 179.) She stated that Plaintiff has borderline intellectual functioning that limits him to simple operations of a routine nature and that he is moderately limited in the ability to understand, remember, and carry out detailed instructions. (R. 167, 165.) Dr. Brister opined that Plaintiff is capable of simple substantial gainful activity and that he would do best in a position where the ability to read and write was not integral to successful task completion. (R. 167.)

In October 2007, Dr. Dave Coleman, a licensed psychologist, evaluated Plaintiff for the Division of Rehabilitation Services (hereinafter "DORS"). (R. 185-90.) DORS had requested testing to determine Plaintiff's IQ, achievement level, and vocational interests. (R. 185.) DORS also requested information about whether Plaintiff has a learning disability, what jobs he would be able to perform, and what support systems would be available to him. (R. 185.) Plaintiff demonstrated a full scale IQ of 70, verbal IQ of 67, and performance IQ of 78. (R. 186.) Dr. Coleman stated that Plaintiff's scores placed his overall cognitive functioning at the low end of the borderline mental retardation range. (R. 187.) Dr. Coleman opined that Plaintiff's academic skills ranged from second grade to fifth grade, and that his scores on academic testing were lower than his IQ scores would predict. (R. 188.) Dr. Coleman noted that Plaintiff had markedly high scores on negative affect and psychotic features and moderately high scores on social withdrawal, hostile control, suicidal thinking, and aggressive control. (R. 188.) Dr. Coleman opined that Plaintiff's scores suggested anxiety and socialization problems, but stated he would need a more detailed evaluation for diagnosis. (R. 188.) Dr. Coleman also noted that Plaintiff test scores indicated he was interested in the automotive, building, animal care, horticulture, and housekeeping fields. (R. 188.) Dr. Coleman opined that Plaintiff's cognitive and academic strengths were consistent with entry-level jobs in those areas, and also in the areas of laundry labor, packing and sorting, and warehouse work, but Plaintiff had expressed no interest in those areas. (R. 189.)

Dr. Coleman opined that Plaintiff satisfied DSM-IV standards for borderline to mild mental retardation and learning disorders; he also stated that Plaintiff was not a good candidate for vocational training and he will learn best slowly and with pictures. (R. 189.) Dr. Coleman further indicated that additional assessment of emotional and personality issues was needed to make a formal diagnosis, determine treatment, and determine whether medication is appropriate. (R. 189-90.) Dr. Coleman stated that if competitive employment is sought, a job coach should be considered to assist with "soft skills," learning on the job, and possible conflicts. (R. 190.) Furthermore, Dr. Coleman stated that, given Plaintiff's cognitive and academic levels, sheltered employment should be considered while Plaintiff's productivity, emotional needs, training needs, and other areas are further evaluated.

### C.  The Hearing Before the ALJ

In October 2007, the ALJ held a hearing at which Plaintiff, Dr. James Lanier, a vocational expert (hereinafter "VE"), and Rose Watson, Plaintiff's mother, testified.

Plaintiff testified that he has two children, ages 16 and 8, and lives with the younger son in his parents' basement. (R. 249-50.) He has a driver's license, but he usually has someone drive with him. (R. 250.) He received unemployment for six months several years ago. (R. 252.) He has a high school education, no college, and no vocational training. (R. 253.) He can write his name, but he cannot read a newspaper. (R. 253.) He is not sure how he graduated high school, but he had books read to him when he studied. (R. 253.) He has worked for a friend off and on for a few years doing odd jobs such as picking up garbage or siding. (R. 254-56.) Plaintiff stated he has applied for a job everywhere in his home town. (R. 256.)

Plaintiff testified that he worked for Canteen delivering money for about four years. (R. 257.) He delivered money bags from one branch to another, but was unsure how much the money bags weighed. (R. 257.) He always had someone in the delivery truck with him, and they took turns driving. (R. 258.) He testified that he worked in a foundry when he graduated

school. (R. 258.) When he worked at the foundry he had to take the core out of a machine and put it on a belt. (R. 258.) He has worked as a carpet layer for his uncle and as a hand packager, but the employer fired him after six months. (R. 259.)

Plaintiff testified that he gets up and gets his son ready for school, but his parents have to fix his son breakfast because he cannot. (R. 260.) Once his son is at school, Plaintiff helps his parents around the house. (R.260.) He can mop if his parents let him, and he can sweep or vacuum, which he calls the "dusting thing." (R. 260.) He testified that he is unable to cook because he burns everything. (R. 260-61.) He has never tried to do laundry, but thinks if someone showed him how he could learn. (R. 261.) To pass time, he helps his parents and runs errands with them. (R. 261.) He has a truck, but he does not drive out of town alone, because he gets lost. (R. 261-62.) He watches television sometimes, but just watches whatever is on, and he cannot read. (R. 262.) He described himself as antisocial, but he gets along with his parents, son, and neighbors. (R. 262-63.) He talks to his older son on the phone, but is not allowed contact with him often. (R. 263.) He does not belong to any clubs, organizations, or churches, but stated that he tries to go to church every week. (R. 263.) He helps with the lawn when his mother lets him, but he is not allowed to help in her flower garden. (R. 264.) He enjoys riding his bike with his son around the block. (R. 264.) Plaintiff stated he smokes a pack of cigarettes a day, but does not consume alcohol. (R. 264-65.)

Plaintiff testified that he does not have any physical problems, but he is depressed. (R. 265.) He has never gone to a psychologist or psychiatrist for help with his mental impairments. (R. 265.) When told what a panic attack was, he testified that he did have panic attacks when it was hard to breathe. (R. 266.) He has panic attacks whenever he thinks about his life. (R. 266.) He does not have ideations of suicide, and has never attempted to take his own life. (R. 266.) He did not understand what concentration was, and was unsure if he could keep his mind focused on what he was doing. (R. 266-67.) Plaintiff testified that he does not know how much he could lift, but thinks he could try to lift 50 pounds. (R. 267.)

When questioned by his attorney, Plaintiff testified that he obtained his job at Canteen because his uncle worked there. (R. 268.) His uncle would record his hours, tell him where to drive, and generally help him. (R. 268.) He stated that he would not have been able to keep the job if he did not have his uncle's help. (R. 268.) He testified he was fired from Sigma within the first 90 days because he had too many "mispicks." (R. 269.) He stated that he worked at a bike shop where he was only allowed to sweep the floor, because he was not smart enough to do anything else. (R. 269.) His mother fills out applications for him, and he signs them. (R. 269.) He has a checkbook, but he only signs checks after his mother has filled them out. (R. 269-70.) He testified that he received his driver's license on the third try after the test was read aloud to him. (R. 270.) His son is in the first grade and brings home spelling words that are too difficult for him to spell, which makes him feel bad. (R. 270.) Plaintiff has dyslexia, his father has dyslexia, and now he believes his son has dyslexia. (R. 270.)

Ms. Watson testified she is Plaintiff's mother, and she sees him every day because he has been living with her for the past four to six years. (R. 272.) She takes care of his finances, because in her opinion he is not able to. (R. 272.) She stated he has been applying for jobs, but she has to fill out the applications because he cannot read or write. (R. 272-73.) He has a high school diploma, but she is unsure how he achieved it. (R. 273.) He started special education classes in the first or second grade, but was still unable to learn. (R. 273-74.) He is very depressed, and she is concerned that she may come home and find him "hanging from the rafters." (R. 274.) He uses his income to help out with bills or his son. (R. 275.) She has tried to get him to the doctor, but he will not go because he feels like he will be fine. (R. 275-76.)

The ALJ gave the VE a hypothetical question regarding an individual who could perform medium work that was limited to simple, repetitive tasks and instructions. (R. 278.) The VE testified that such an individual could perform Plaintiff's prior work of foundry laborer and hand packager. (R. 278.) The VE testified that his testimony was consistent with the *Dictionary of Occupational Titles*. (R. 278.)

When questioned by Plaintiff's attorney, the VE testified that if all of the individual's high school classes were special education classes and the individual could not read or write, he could still perform the foundry and hand packager jobs. (R. 279.) He further opined that to keep the jobs, a person would have to be productive 90 percent of the time. (R. 279.)

At the request of Plaintiff's counsel, the ALJ held the record open for two weeks so that a Department of Rehabilitative Services report could be placed into the record. (R. 245, 279-80.)

### D.  The ALJ's Report and Decision

The SSA defines "disabled" as the inability "to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). To determine whether a claimant is disabled within the meaning of the Social Security Act, the ALJ must proceed through a five-step analysis. 20 C.F.R. § 416.920(a)(4). If the claimant is currently employed or was previously employed during the relevant period, he is not disabled. 20 C.F.R. § 416.920(a)(4)(i). The second question is whether the claimant has a severe medical impairment that will last at least twelve months. 20 C.F.R. § 416.920(a)(4)(ii). If the claimant does not have a severe impairment, the claimant is not disabled, and the inquiry ends. *Id*. The third question is whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the Regulations. If he does, the claimant is considered disabled and the inquiry ends there. If not, between steps three and four, the Commissioner determines the claimant's residual functional capacity, that is, the work he is still able to perform despite limitations. 20 C.F.R. § 404.1545. The fourth question is whether the claimant is able to perform his past relevant work with his current impairment. 20 C.F.R. § 416.920(a)(4)(iv). If he can, then he is not disabled. *Id.* If he cannot perform his past work, the fifth and final question is whether with his current limitations he can perform other work that exists in significant numbers in the national economy. 20 C.F.R. § 416.920(c)(1).

The claimant bears the burden of production and persuasion at steps one through four. Once the claimant shows he is unable to perform past work, the burden shifts to the Commissioner to show that the claimant is able to engage in some other type of substantial gainful employment. *Campbell v. Shalala*, 988 F.2d 741, 743 (7th Cir. 1993).

Here, the ALJ found that Plaintiff has the severe impairment of mental retardation, but his impairment does not meet or medically equal any of the listed impairments. The ALJ determined that Plaintiff has the RFC to engage in a full range of medium work limited to simple, repetitive tasks/instructions. Based on this RFC and the VE's testimony, the ALJ determined that Plaintiff was able to perform his past relevant work, therefore Plaintiff was not disabled as defined by the Social Security Act.

## II.  Standard of Review

The ALJ's decision is subject to review pursuant to 42 U.S.C. § 405(g), which provides that "the findings of the commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The United States Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consol. Edison Co. v. New York*, 305 U.S. 197 (1938)). Where conflicting evidence may allow reasonable minds to differ as to whether a claimant is disabled, the responsibility for making that determination rests with the ALJ. *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996); *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). Therefore, on review, the Court does not determine whether the claimant is disabled, but whether substantial evidence in the record supports the ALJ's finding of no disability. *Id.* The Court defers to the ALJ's determinations of credibility, "so long as they find some support in the record." *Edwards v. Sullivan*, 985 F.2d 334, 338 (7th Cir. 1993).

### III.  Discussion

Plaintiff argues that the ALJ erred by (1) making an erroneous credibility finding, (2) making an erroneous RFC determination, and (3) giving an incomplete hypothetical to the VE at step four of the five-step evaluation.

Plaintiff also argues that the Appeals Council erred by upholding the ALJ's decision and not reversing for consideration of new evidence, specifically, a biopsychosocial assessment dated December 27, 2007.  Plaintiff contends that the new evidence supports a finding of disability and the Appeals Council should have reversed the ALJ's determination.  However, the additional evidence submitted to the Appeals Council after the ALJ's decision is not part of the record for the purpose of our review under 42 U.S.C. § 405(g), sentence four.  *See Eads v. Sec'y of Dep't of Health & Human Servs.,* 983 F.2d 815, 817 (7th Cir. 1993) (where the Appeals Council denies review, courts cannot consider evidence that was not part of record before the ALJ).  Because this evidence was not available to the ALJ, the Court cannot consider it.

### A.  Credibility

Plaintiff argues that the record does not support the ALJ's credibility determination.  Specifically, Plaintiff contends that the ALJ mischaracterized Plaintiff's daily activities and medical history.  Additionally, Plaintiff contends that the ALJ erred by concluding that Plaintiff's failure to seek treatment for his mental condition indicated the Plaintiff did not suffer from a mental disorder.

The ALJ stated that Plaintiff was not credible because his daily activities and medical record were not consistent with his alleged degree of limitation.  The ALJ found that Plaintiff is independent, lives with his parents and son, performs household chores, drives, rides a bicycle, and has worked sporadically since the alleged onset date.  The ALJ acknowledged that Plaintiff testified he experienced depression and panic attacks, but he also noted that Plaintiff has never sought treatment for these problems, implying that this undermined his credibility.

Plaintiff presents the following information to support his contention that the ALJ mischaracterized the evidence: Although Plaintiff has worked sporadically since the onset date, it has mostly been sheltered work for friends and family. Similarly, Plaintiff does perform household chores, but only when his mother allows him, and he cannot do laundry. Plaintiff can bathe himself, but he still relies on his mother for meals, clean laundry, and entertainment. Plaintiff has a driver's license, but he cannot drive outside of his hometown by himself; if he is going out of his hometown, another adult must accompany him or he will get lost. Plaintiff lives with his son in his parents' home and helps care for his son, but he cannot prepare his son's meals because he burns everything he cooks. Finally, Plaintiff notes that the fact that he can ride his bicycle around the block with his son does not undermine his credibility regarding his limitations because his claim of disability is not based on his physical condition. The Court agrees with Plaintiff that the ALJ mischaracterized the evidence he relied on to support his credibility finding.

In a recent decision, the Seventh Circuit court stated that, in reviewing a credibility determination, a court "merely examine[s] whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213-14 (7th Cir. 2001)). "[O]nly when the ALJ's determination lacks any explanation or support . . . [will we] declare it to be patently wrong." *Id.* at 413-14. Here, the ALJ explained why he discredited Plaintiff's statements. However, his reasoning was flawed because he mischaracterized the evidence upon which he relied to support his finding. Thus, the ALJ's credibility determination was patently wrong and the Court recommends remand for reconsideration of Plaintiff's credibility.

### B. RFC Finding

Plaintiff next argues that the ALJ's RFC determination is erroneous because he relied on the State agency doctor's evaluations and, as a result, he did not consider Dr. Coleman's findings

or allow further investigation after Dr. Coleman's report opined that further testing was necessary. Similarly, Plaintiff contends that the ALJ's consideration of whether Plaintiff met Listing 12.05 was inadequate because the ALJ did not take into account Dr. Coleman's evaluation.

Plaintiff first contends that the ALJ erred by relying on Dr. Brister's report because the State agency doctor had insufficient information and formed her opinions before Dr. Coleman's report was part of the record.

Dr. Brister completed her Psychiatric Review Technique form and mental RFC assessment in 2004. Dr. Coleman examined Plaintiff and wrote his report in 2007. The only medical evidence available to Dr. Brister was Dr. Mason's July 2004 consultative examination report. While Dr. Brister's findings were consistent with Dr. Mason's report, Dr. Coleman's October 2007 report indicates more limitations than Dr. Brister described. The ALJ can give weight to State agency medical consultants only insofar as they are supported by the evidence of the entire case record, including evidence that was not before the State agency physicians. SSR 96-6p.

More than three years elapsed between the date of Dr. Brister's report and Dr. Coleman's evaluation. Given that time span and the absence of any medical evidence that is closer in time to Dr. Coleman's evaluation, the Court concludes that Dr. Coleman's findings regarding Plaintiff's limitations were uncontradicted by other medical evidence. Although the ALJ mentioned Dr. Coleman's findings and noted that Dr. Coleman opined further testing was needed, he erred by failing to incorporate the limitations mentioned by Dr. Coleman's findings into the RFC. The only explanation that the ALJ gave for this was that "there were no diagnoses made in those areas [relating to deficits in social skills and issues with anxiety] at the time." (R. 20.) As Plaintiff points out, the absence of a diagnosis does not imply the absence of a limitation or condition. Even in the absence of a formal diagnoses, Dr. Coleman noted that Plaintiff had mental limitations that the ALJ did not discuss or take into account. The ALJ

discussed only one issue, Dr. Coleman's finding that Plaintiff had problems related to social functioning. He expressly rejected that finding, stating that he had "observed that Mr. Watson was able to interact and respond appropriately at the time of hearing." (R. 20.) The latter statement is a classic example of an ALJ playing doctor. The ALJ cannot "play doctor," substituting his own medical opinion for that of the treating physician. *See Metzger v. Astrue*, 263 F. App'x 529, 532 (7th Cir. 2008) (stating that the ALJ must explain his rationale by creating a "logical bridge" between the substantial medical evidence and the conclusion).

The ALJ cannot base his RFC determination on his own lay opinions about the medical evidence; he must reach conclusions based on the existing record or question a medical expert to supplement the record. *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003). Here, Dr. Coleman's report was the only medical evidence available after the 2004 reports by Drs. Mason and Brister. Dr. Coleman's report indicated several times that Plaintiff's condition merited further evaluation. For example, Plaintiff scored above 50 on several dimensions of the PAS and Dr. Coleman stated that "P-Scores above 50 usually indicate the need for additional follow-up." (R. 188.) Noting Plaintiff's markedly high scores on negative affect and psychotic features and moderately high scores on several other areas, Dr. Coleman stated that "[h]is scores are suggestive of anxiety and socialization problems, but a more detailed evaluation would be required in order to make any diagnosis." (R. 188.) Finally, Dr. Coleman recommended "[a]dditional assessment of possible emotional or personality issues . . . given Mr. Watson's PAS scores, his reported loss of a job due to conflict with a supervisor, and his reported prior depression." (R. 189.)

The ALJ's duty to fully and fairly develop the record is clear, and a breach of this duty may provide grounds for a reviewing court to remand for further proceedings. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). This obligation necessarily takes on a heightened significance when, as here, the underdeveloped issue may carry controlling weight. Social Security proceedings are inquisitional rather than adversarial in nature and the ALJ must

investigate the facts and develop arguments for and against granting benefits. *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000). However, the ALJ is not required to act as Plaintiff's counsel. *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994).

According to the Regulations and the Seventh Circuit court, an ALJ must recontact medical sources "only when the evidence received is inadequate to determine whether the claimant is disabled." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004); 20 C.F.R. § 404.1512(e). Thus, the relevant question is whether the medical evidence available to the ALJ provides a sufficient basis for a decision. Judicial review of administrative decisions is deferential, and courts must respect the authority of an ALJ to decide how much evidence is necessary in a given case. *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993) ("[I]t is always possible to do more. How much evidence to gather is a subject on which district courts must respect the [Commissioner's] reasoned judgment."). "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Binion v. Shalala,* 13 F.3d 243, 246 (7th Cir. 1994). This is particularly true in light of the fact that the claimant, not the ALJ, bears the burden of presenting medical evidence of an impairment. *Eichstadt v. Astrue,* 534 F.3d 663, 668 (7th Cir. 2008); 20 C.F.R. § 404.1512(a).

Here, however, Plaintiff is not relying on "mere conjecture or speculation"; instead, Dr. Coleman's report states that Plaintiff's test scores suggest certain mental problems that will likely affect his ability to work and that he cannot diagnose Plaintiff without further evaluation. Under these circumstances, the Court concludes that the ALJ erred by failing to further develop the record once Dr. Coleman indicated the need for more evaluation. Accordingly, the Court recommends remanding this case for further proceedings.

### IV.  Summary

For the reasons set forth above, this Court recommends Plaintiff's Motion for Summary Judgment **(#12)** be **GRANTED**. The parties are advised that any objection to this

recommendation must be filed in writing with the clerk within ten working days after being served with a copy of this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Video Views, Inc. v. Studio 21, Ltd.*, 797 F.2d 538, 539 (7th Cir. 1986).

ENTER this 14th day of September, 2009.

s/ DAVID G. BERNTHAL<br>U.S. MAGISTRATE JUDGE